James W. Zacharie

*v.*

Rebecca E. Godfrey *et al.*, Administrators.

1. Alien enemy—*of the condition of persons during the late rebellion.* A person residing in one of the States engaged in the late rebellion at the breaking out of the war, soon after left his home, remaining absent until the termination of hostilities; meanwhile his family continued to reside at their home in the rebellious State, while his place of abode was, for a portion of the time in the loyal States and the residue in neutral countries, but intending all the while to return

to his former home at the close of the war.  He was always faithful to the union and opposed to secession: *Held*, that he would not be regarded as an alien enemy ; that he lost none of his rights as a citizen of the United States by reason of his temporary and constrained residence in the rebellious district after the war commenced, and was at liberty at any time to sue in the courts of this State.

2.   In such a case, if the party had sought, during the war, to recover a debt in one of our courts, the inquiry would be, not whether the plaintiff had a legal citizenship in a rebel State at the opening of the war, which he might and intended to resume at its close, but where his actual residence was during the war, and whether, if allowed to recover his dues, the probable effect of a recovery would be to place the amount recovered within the reach of the enemy.

3.   Limitations—*operation of the statute in relation to such person.*  A person thus situated, being under no disability to bring suit in our courts during the war, the statute of limitations did not cease to run against him during that time.

Writ of Error to the Alton City Court.

This was an agreed case brought up on error to this court. The facts are fully stated in the opinion.

Messrs. Billings, Wise & Sawyer, for the plaintiff in error.

The only question, presented to the court for its decision, is, did the statute of limitations continue to run as to the plaintiff or was it suspended during the rebellion ?

We think it to be a well settled rule of law, that a civil war suspends all intercourse between the citizens or inhabitants of the States engaged in civil war, as much as a national war does between nations.   The Supreme Court of the United States has decided this in numerous cases.

That a civil war existed between the northern and southern States is too well known to be controverted.

One belligerent engaged in actual war, has a right to blockade the ports of the other, and neutrals are bound to respect that right.

The parties to a civil war are in the same predicament as two nations who are in a contest and have recourse to arms. Prize cases, 2 Black, 685.

A state of actual war may exist without a formal declaration of war by either party. Ib.

The proclamation of blockade is of itself conclusive evidence that a state of war existed, which demanded and authorized recourse to such measures. See proclamations of April 15th, 19th, 27th, and May 3d, 1861.

All persons residing within the territory occupied by the hostile party in the contest are liable to be treated as enemies, though not foreigners. Prize cases, 2 Black, 635.

All the subjects of two nations or States at war, are enemies. Vattel's Law of Nations, book 3, chap. 5, sec. 70.

And they continue to remain enemies in all places. The place of abode is of no consequence here. It is the political ties which determine the character. Ib. sec. 71, page 321.

While a man continues a citizen of his own country he is the enemy of all those with whom his nation is at war. Ib. Women and children are members of the nation and they are to be ranked in the class of enemies. Ib. sec. 72, page 322, &c.

Every individual of one nation must acknowledge every individual of the other nation as his enemy. The Prize case Rapid, (Perry, master,) 8 Cranch, 155; the Venus, (Rea, master), 8 Cranch, 290.

The dispositions of the individual inhabitants of enemy territory as distinguished from those of the enemy people generally, cannot be inquired into, &c. Mrs. Alexander's cotton, 2 Wallace, 404; The Peterhoff, 5 Wallace, 60.

The war then having existed, it did suspend all intercourse between the inhabitants of the States so engaged in the war, both by the law of nations and by the acts of congress. By the rules of the common law an alien enemy cannot maintain an action in the courts of this country in his own name during the war. *Crawford* v. *The Wm. Penn*, 1 Dal. 69 ; *Mumford* v. *Mumford*, 1 Gallis. 363.

An alien enemy may take personal property by succession as next of kin, but cannot recover it during war. *Bradwell*

v. *Weeks*, 1 Johns. Ch. 206; 13 Johns. 1; *Bill* v. *Chapman*, 10 Johns. 183.

Commercial intercourse between parties in the northern and southern States during the late rebellion, having been prohibited both by the general rule of public law, and expressly by the act of Congress of 13th of July, 1861, and the President's proclamation in pursuance thereof, of the 16th of August, 1861, all contracts and legal actions were suspended during the war, between persons in the territory of either belligerent and persons in the territory of the other. The Prize cases, 2 Black, 636; Mrs. Alexander's cotton, 2 Wallace 404. See the decree, ib. 258.

The statute of limitations is suspended during a state of war as to matters in controversy between citizens of the opposing belligerants. *Jackson Ins. Co., &c.* v. *Stewart*, 15 Law Register, 732, a case decided in the Circuit Court of the District of Maryland. The statute of limitations was suspended during the revolutionary war, and began to run again against debts due by citizens of the United States to British creditors from the final peace between the United States and Great Britain. *Ogden* v. *Blackledge*, 2 Cranch, 272, Condensed Rept. 411; *Brewer* v. *Hastie*, 3 Call, 22; *Griswold* v. *Waddington*, 16 Johns. 438; *Hoar* v. *Allen*, 2 Dallas, 192; *Wall* v. *Robson*, 2 Nott and McCord, 498; *Moses* v. *Jones*, 2 Nott and McCord, 259; *McCall* v. *Turner*, 1 Call, 133; *Foxcroft* v. *Nagle*, 2 Dallas, 132.

Having once shown that the plaintiff was domiciled at New Orleans, in the territory of the belligerent States, we contend he must be considered to remain there until a new one is established. *Putnam* v. *Johnson*, 10 Mass. 480. A domicile once fixed will continue notwithstanding the absence of the party, until a new domicile is acquired. *Jennison* v. *Hapgood*, 10 Pick. 77.

If a person goes out of the State, county or town for a particular purpose, and does not take up a permanent residence elsewhere, he cannot be considered as having removed from

the State, county or town so as to affect his domicile and inhabitancy. Sacket's case, 1 Mass. 4; *Abington* v. *Barton,* 4 Mass. 312 ; *Commonwealth* v. *Walker,* 4 Mass. 556 ; *Lincoln* v. *Hapgood,* 11 Mass. 350 ; *Harvard College* v. *Gore,* 5 Pick. 370.

An absence of five years will not change the domicile of a party, he having left home to seek temporary employment. *Knox* v. *Waldobrough,* 3 Greenl. 455; *Catlin* v. *Gladden,* 4 Mason, C. C. R. 308.

There must be an intention to change domicile. *Cooper* v. *Galbreth,* 3 Wash. C. C. R. 546 ; the Neriede, 9 Cranch, 338 ; in the matter of Weigley, 4 Wend. 602 ; again, 8 Wend. 134.

Messrs. L. & L. DAVIS, for the defendants in error.

We refer the court to the case of the Peterhoff, 5 Wallace, page 60. In that case the court says :

" It has been held by this court that persons residing in the rebel States at any time during the civil war, must be considered as enemies during such residence without regard to their personal sentiments or dispositions," (referring to Prize cases, 2 Black, 666, 687 ; the Venice, 2 Wallace page 258, and Mrs. Alexander's cotton case, 2 Wallace, page 404); " but this has never been held in respect to persons faithful to the union, who have escaped from those States and have subsequently resided in the loyal States or in neutral countries ; such citizens of the United States lost no rights as citizens by reason of such temporary and constrained residence in the rebellious portions of the country."

There is another principle upon which the decision of the court below can, in our judgment, be sustained, and which we will advert to. It is this: the plaintiff having left New Orleans in February, 1862, and established himself in commercial business in a neutral country, is entitled to be treated

and deemed a neutral, upon the principles of international law, and as such had the right to hold commercial intercourse and trade with the citizens of the loyal States.    See 8 Cranch, 280, case of the Venus, Rae, master.

The case of *Edgar Tucker* v. *Watson, McGill, & Co.*, decided in the District Court of Appeals of Virginia, and reported in the February number of the Law Register, 1867, page 220, is not a case in point.    In that case it appeared that Watson, McGill & Co., were, during the war, citizens and residents of Petersburg, in the State of Virginia.    There was no evidence that they had changed their residence.    The evidence was, that McGill, one of the firm, was in Canada and Boston in the fall of 1861, the other partners being all the time citizens and actual residents of Virginia, and no evidence that McGill had ever changed his residence.    Under these facts the court held that they were all residents of Virginia during the war, and could not recover interest on their claim for the period embraced in the war.    The court say in that case: "There is nothing in the case to indicate that any one of the parties changed his residence in the year 1861 or subsequently."

Mr. JUSTICE LAWRENCE delivered the opinion of the Court:

This was a suit brought by Zacharie against the administrator and heirs of Benjamin Godfrey, deceased, in the Alton City Court, to recover a sum of money alleged to have been owing by the deceased to plaintiff.    The estate had been settled, and the object of this suit was to reach property descended to the heirs.    The defendants pleaded the statute of limitations, and the court gave judgment in their favor. The record is brought here upon an agreed state of facts, it being admitted that the deceased acknowledged his indebtedness as late as March 13th, 1861, and the question being whether the statute of limitations ran against the plaintiff during the late war.

It is admitted that Zacharie resided in New Orleans at the breaking out of the rebellion, and had resided there for sixty years; that on the 24th of August, 1861, he left New Orleans for Cuba and Mexico, to attend to his private business; that prior to January, 1862, he was taken from a British vessel bound for Metamoras by an American ship of war, and carried to Fort Lafayette, in the harbor of New York; that he was released by order of the government, on the ground of his being a loyal citizen; that he returned to New Orleans in January, 1862, and in February, 1862, he again left that city, engaged in trade between Havana and Mexico, and continued in such trade until after the termination of the war in 1865, when he returned to New Orleans where his family had constantly resided, and where was his home. He was loyal to the government and opposed to secession from the commencement of the war, and in December, 1863, took the oath of allegiance under the President's proclamation of that year, before the United States consul at Tampico.

On this state of facts, it is urged by plaintiff's counsel, that he never lost his residence in Louisiana, and that whatever may have been his personal loyalty, if he had his residence in the hostile territory, he is to be regarded as an alien enemy, and as having been subject to the disabilities of that position. It is further urged, that one of these disabilities, was the incapacity to sue in the courts of Illinois, and hence our statute of limitations did not run against him during that period.

It is unnecessary to pass upon this last point, as the agreed facts do not sustain the theory that Zacharie was under the disabilities of an alien enemy.

It is true, as urged by plaintiff's counsel, that the Supreme Court of the United States has decided in the Prize cases, 2 Black, 635, and in the case of Mrs. Alexander's cotton, 2 Wallace, 404, that all persons residing within the hostile territory were liable to be treated as enemies, and the disposition of individuals cannot be inquired into. But the same court, in the case of the Peterhoff, 5 Wallace, 60, after referring to

these cases, says: "but this has never been held in respect to persons faithful to the Union, who have escaped from those States, and have subsequently resided in the loyal States or in neutral countries; such citizens of the United States lost no rights as citizens by reason of such temporary and constrained residence in the rebellious portions of the country."

The principle here announced governs the case before us. Although the plaintiff, if he left Louisiana immediately after the commencement of the war, with the intention of returning when the war should close, his family meanwhile remaining there, would not be considered, for most purposes, as having lost his citizenship there, or his technical legal residence, yet the general principle announced in the Prize cases and in Mrs. Alexander's case must necessarily be so qualified as not to apply to a case like this, and the qualification was declared in the case of the Peterhoff. It would be unjust in the extreme to hold, that a loyal citizen, leaving the rebellious States at the opening of the war, and having his abode during its continuance on loyal or neutral ground, should be considered as disabled from suing in our courts in consequence of the war which was being waged by the people whom he had left, a war which he did not approve, and which he had saved himself from the liability of supporting by leaving the hostile territory. If, during that period, he had brought suit in the courts of this state for the recovery of this debt, and had been met with the plea of alien enemy, and, on the trial of that issue, the same facts had appeared which have been disclosed by the present record, no court would have held the plea to be sustained. To have held that loyal refugees from the rebellious States were not entitled to be heard in our courts, would have tended to drive them back to the rebellion, while to have permitted them to recover debts that were due to them would not in any degree have conduced to its support, as the money or property recovered would not be brought, by the recovery, within the reach of the enemy, and rendered liable to seizure by him for the maintenance of the war. In

13—50TH ILL.

such a case the courts would have inquired, not whether the plaintiff had a legal citizenship in a rebel State at the opening of the war, which he might resume at its close, but where his actual residence was during the war, and whether, if allowed to recover his dues, the probable effect of a recovery would be to place the amount recovered within the reach of the enemy, and if satisfied upon these points, they would not have closed their doors upon a plaintiff merely because he intended to return to his family and former home after the war should close. We had many men in the north during the war, and some of them in the military and civil service of the government, who having left their homes and families from apprehension of being forced into the rebel service, were among the most loyal of our people, and it was never supposed our courts must regard them as alien enemies, because of the character of the community whence they came.

Counsel for plaintiff cite *Tucker* v. *Watson*, 15 Law Register, 220, decided by the Court of Appeals of Virginia, as sustaining their position, but the plaintiff in that case had not merely his legal citizenship, but his actual residence, in the State of Virginia during the war.

We hold the plaintiff in this record was under no disability to bring suit during the war, and the statute of limitations did not cease to run against him. Whether it would have run, had he been an actual resident, during the war, of a rebellious State, is a question we have not considered.

*Judgment affirmed.*